Filed 9/15/23  In re A.F. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| In re A.F., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>N.F.,<br><br>Defendant and Appellant. | F085968<br><br>(Super. Ct. No. 21CEJ300246-1)<br><br>**OPINION** |

**THE COURT**\*

APPEAL from an order of the Superior Court of Fresno County.  Mary Dolas, Judge.

Roshni Mehta, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Franson, Acting P. J., Snauffer, J. and DeSantos, J.

N.F. (mother) appeals from the juvenile court's January 26, 2023 order terminating her parental rights (Welf. & Inst. Code, § 366.26)[1] to her now two-year-old daughter, A.F. After reviewing the juvenile court record, mother's court-appointed counsel informed this court she could find no arguable issues to raise on mother's behalf. We granted mother leave to personally file a letter setting forth a good cause showing that an arguable issue of reversible error exists. (*In re Phoenix H.* (2009) 47 Cal.4th 835, 844.) While mother filed a letter, she failed to make such a showing. Consequently, we dismiss the appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

One-month-old A.F. (the baby) presented to the emergency room on July 3, 2021, with bruising on her face, chest, mid-back, and arm. Further evaluation revealed multiple bilateral rib fractures of varying age, a left pulmonary contusion and left hemothorax. The fractures and laboratory test results were indicative of blunt force trauma and child abuse. The baby was admitted to the hospital where she remained for three days. Testing for a bone-related deficiency or genetic disorder was normal.

Mother and her boyfriend, E.M., the baby's father, lived with maternal relatives. Mother noticed bruising on the baby's chest on July 1, 2021, and showed them to the maternal grandmother, but they thought the bruises were a birth mark or were made when mother breastfed. On the early morning of July 3, mother noticed bruising on the baby's eye. She discussed the bruises with maternal grandmother, and they decided she should take the baby to the hospital, which mother and E.M. (father) did that day.

Mother denied hurting the baby or observing anyone else hurt her. She and father were the primary caregivers, although she left the baby with maternal grandmother for about two hours the week before while she and father went to the store. She had no concerns about father or maternal grandmother caring for the baby.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

The Fresno County Department of Social Services (department) took the baby into protective custody and placed her in foster care when she was discharged from the hospital. She was subsequently placed with her paternal grandmother.

The department filed a dependency petition alleging the baby came within the juvenile court's jurisdiction under section 300, subdivisions (a) (serious physical harm), (b)(1) (failure to protect), (e) (severe physical abuse), and (i) (cruelty) because the baby sustained serious injures consistent with child abuse while in her parents' care. Neither parent could explain how the injuries occurred. The juvenile court ordered the baby detained, offered mother random drug testing, and ordered twice weekly supervised visitation.

### *The Jurisdiction and Disposition Hearing*

A contested hearing on jurisdiction and disposition was held over several sessions in April and May 2022. The department recommended the juvenile court sustain the petition and deny the parents reunification services under section 361.5, subdivision (b)(5) and (6). Pending the hearing, mother completed a 12-week parenting class and a first aid class for children. She was evaluated for but did not need substance abuse or mental health treatment. She began drug testing in August 2021 and tested positive for creatinine in August through October 2021 and January 2022. She began individual counseling in August 2021 to deal with the abuse of the baby and loss of custody. In August 2021, she reported that father moved out of the home and they were no longer an intact couple. The parents regularly visited the baby and the visits went well.

Testimony was received from numerous witnesses, including: (1) Dr. Sindhura Kodali, a child advocacy physician and pediatric hospitalist, who opined the baby's injuries were due to nonaccidental trauma and suggested forceful squeezing and potentially some blunt force trauma to the chest; (2) Dr. Trenton Hubbard, a child abuse pediatrician who saw the baby in his outpatient clinic and authored a report that agreed with Kodali's findings; (3) mother's therapist Dr. Judith Casas, who was working with

3.

mother as a potential abuser; (4) father, who did not know how the baby sustained the injuries but believed someone in mother's family injured her; (5) maternal grandfather, who heard the baby cry when father changed her; (6) mother's older brother, who believed father may have hurt the baby; and (7) mother, who testified she did not fully understand the baby's injuries until she heard Kodali's testimony, and when she understood the baby had been injured, she realized father caused her injuries.

During the proceedings, at the department's request, the juvenile court struck the language in the petition that the rib fractures were " 'of varying age.' " The juvenile court found one allegation under section 300, subdivision (b)(1) that mother had a substance abuse problem was not proven, but otherwise sustained the petitions' allegations. The juvenile court ordered the baby removed from parental custody and denied the parents reunification services. (§ 361.5, subd. (b)(5) & (6).) The court set a section 366.26 hearing for August 23, 2022.

Mother filed an extraordinary writ petition. (Cal. Rules of Court, rule 8.452.) In her petition, mother did not challenge the juvenile court's jurisdictional findings and dispositional orders, but rather argued the court abused its discretion in not continuing reunification services to the 18-month review hearing. We dismissed mother's petition because she failed to assert juvenile court error. (*N.F. v. Superior Court* (July 26, 2022, F084376) [nonpub. opn.].)[2]

### *The Section 366.26 Hearing*

At the August 23, 2022 hearing, mother asked for a contested hearing. The juvenile court set a settlement conference for December 6, 2022, and the trial for

---

[2] Father also filed a writ petition, in which he argued there was insufficient evidence to support a denial of reunification services under either section 361.5, subdivision (b)(5) or (6). We denied the petition after concluding substantial evidence supported the denial of services under section 361.5, subdivision (b)(6). (*E.M. v. Superior Court* (Aug. 3, 2022, F084391) [nonpub. opn.].)

December 13, 2022. The day before the hearing, mother filed a modification petition (§ 388), asking the juvenile court to order reunification services for her. Mother asserted she did not know the baby's ribs were injured, and she had been enrolled in therapy and domestic violence classes, she had a drug assessment, and she completed a parenting class. The juvenile court set a hearing on mother's petition for the same date as the section 366.26 hearing.

By the December 6, 2022 settlement conference, mother filed a substitution of attorney. The trial was continued to January 12, 2023, so mother's new counsel could review discovery.

In an August 2022 report for the section 366.26 hearing, the department recommended the juvenile court find the baby adoptable and terminate parental rights. The baby, who was 14 months old as of the date of the report, appeared to be developing in an age-appropriate manner, and did not have any medical, developmental, or emotional issues that would prevent her adoption. While the baby was receiving early start intervention services, the therapist working with her reported she was doing well and there were no concerns about her developmental ability. The baby was healthy and did not require mental health intervention. Paternal grandmother, who had been caring for the baby since August 2021, wanted to adopt the baby and was open to the parents continuing to visit the baby.

Mother was visiting the baby consistently. She was appropriate during visits, which went well; she played with the baby, fed her, and changed her diaper. The social worker supervised two visits in August 2022. Mother played games with the baby and read to and interacted with her. The baby was comfortable with mother, who hugged, kissed, and caressed the baby. Mother was nurturing and engaging and provided structure and challenge during visits. The department, however, believed the baby's relationship with her parents was not significant enough to outweigh the benefits she

would receive through adoption, as the baby did not look to her parents for security or stability, which adoption would provide.

A contested hearing was held on January 12, 2023. County counsel stated the department, which submitted on the report, continued to recommend adoption and the care provider remained willing and able to adopt the baby. Minor's counsel agreed with the department's recommendation. Father submitted on the report, while mother contested the department's recommendation.

Mother testified she had been visiting the baby regularly since she was placed with paternal grandmother in August 2021. She visited twice a week during the first year of dependency. After paternal grandmother began supervising the visits sometime between August and October 2022, mother would visit once on the weekend for three to four hours. By the time of the hearing, mother saw the baby two or three times per week for a couple of hours each visit.

The day before the hearing, mother visited the baby for six hours. They played together, and mother changed the baby's diaper, made a bottle, and put the baby down for a nap. At visits, the baby would try to call her "mama" and showed mother affection by laying her head on mother's shoulder and chest. If the baby falls, she runs to mother for comfort, and if mother leaves the room, the baby looks for her. According to mother, the baby did not look over at paternal grandmother during visits and did not seem concerned if paternal grandmother left the room. Visits were lasting about six hours and took place at either paternal grandmother's or mother's home. Paternal grandmother told mother visits would not stop if the court were to order adoption, but mother didn't know if she could trust her.

Mother had engaged in services on her own. She attended weekly therapy for domestic violence, which she began in September 2021, and she completed 26 weeks of a 52-week parenting class. Mother learned how to spot domestic violence and the cycle of violence, and how to advocate for herself.

The social worker assigned to the case from August 2021 to May 2022 testified at the beginning of the case she asked mother whether she wanted third-party supervised visitation, but she declined because she was uncomfortable with paternal grandmother supervising visits.

County counsel argued the department met its burden of showing the baby was adoptable, which shifted the burden to mother to demonstrate an exception to termination applied, such as when there is consistent visitation, and the child would benefit from a relationship with the parent. While the department acknowledged mother had consistently visited the baby, there was no evidence the baby would benefit from continuing a relationship with mother. Minor's counsel joined in the department's argument.

Mother's counsel asked the juvenile court not to terminate parental rights and instead order guardianship as the permanent plan. Counsel argued mother had maintained regular visitation and the baby would benefit from continuing a relationship with mother because mother acted appropriately during visits and provided structure and appropriate boundaries for the baby. Counsel asserted there was a bond between the baby and mother such that the baby would benefit from continuing her relationship with mother. Mother's counsel withdrew the section 388 petition.

The juvenile court issued its ruling on January 26, 2023. The juvenile court found the baby was likely to be adopted and mother had not met her burden of proving the beneficial parent-child relationship to adoption applied. The court explained that while mother visited regularly, there was insufficient evidence the baby had such a strong and beneficial relationship with her such that losing that relationship would be harmful to the baby or the relationship outweighed the balance of the security and stability of a long-term permanent plan of adoption. The court found adoption was the appropriate permanent plan for the baby and terminated parental rights.

## DISCUSSION

An appealed-from judgment or order is presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) It is the appellant's burden to raise claims of reversible error or other defect and present argument and authority on each point made. If the appellant fails to do so, the appeal may be dismissed. (*In re Sade C.* (1996) 13 Cal.4th 952, 994.)

At a termination hearing, the juvenile court's focus is on whether it is likely the child will be adopted; if so, the court is required to order termination of parental rights. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) If, as in this case, the child is likely to be adopted, the juvenile court must terminate parental rights unless the parent proves there is a compelling reason for finding that termination would be detrimental to the child under any of the circumstances listed in section 366.26, subdivision (c)(1)(B). Here, the court found the baby was likely to be adopted and the beneficial parent-child relationship exception to termination of parental rights did not apply.

In her letter, mother makes three assertions of error: (1) the juvenile court erred in relying on Dr. Hubbard's testimony because he was not qualified to testify on the age of the baby's fractures since he is not an orthopedic doctor; (2) the juvenile court improperly denied her reunification services; and (3) the juvenile court erred when, in terminating parental rights, it stated mother did not do anything to mitigate her circumstances.

The first two issues are attempts to overturn the juvenile court's jurisdictional findings and dispositional orders. Mother, however, is procedurally barred from challenging these findings and orders, as they were reviewable by the writ petition she filed with this court after the juvenile court set the section 366.26 hearing. (§ 366.26, subd. (*l*).) That petition was mother's opportunity to raise her complaints concerning the juvenile court's findings of jurisdiction and denial of reunification services. Mother cannot now raise these issues on appeal from the order terminating parental rights. (*Ibid.*)

Only the last issue has some relevance to the termination of parental rights. Mother asserts the evidence showed she mitigated the circumstances in her case by attending counseling sessions and obtaining a certificate in parenting. We interpret this as a challenge to the juvenile court's decision not to apply the beneficial parent-child relationship exception to termination of parental rights, which applies if termination would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

In terminating mother's parental rights, while the juvenile court found mother maintained regular visitation and contact with the baby, it did not find sufficient evidence that the baby had "a substantial, positive, emotional attachment" to mother that would imply the baby "would benefit from continuing the relationship." (*In re Caden C.* (2021) 11 Cal.5th 614, 636.) Although mother's progress in services may be relevant to her ability to interact with the baby in a positive way, and therefore help to support a finding the baby would benefit from continuing her relationship with mother, that is not the only factor the juvenile court should consider. (*Id.* at p. 632 [the child's relationship with the parent "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs' "].)

The juvenile court found that given the baby's young age and that she spent most of her life with paternal grandmother, who had been providing for her needs, the baby's relationship with mother was not strong enough to invoke the exception or to show that losing the relationship outweighed the benefits of adoption. To make a good cause showing an arguable issue exists on this record, mother would have to point to evidence the baby had a substantial, positive, emotional attachment to her, and that "terminating that attachment would be detrimental to the [baby] even when balanced against the

9.

countervailing benefit of a new, adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636.) Mother has not made that showing.

We conclude the contentions raised in mother's letter do not establish the existence of any arguable issue that merits briefing. Further, though we are not required to do so, we have reviewed the pertinent parts of the record and we have found no arguable issues for briefing. (*In re Phoenix H.*, *supra*, 47 Cal.4th at pp. 841–842.) Accordingly, we dismiss the appeal.

## DISPOSITION

This appeal is dismissed.